**In the Matter of the Estate of Howard R. Habel, Deceased, Defendant-Appellee, v. In re Petition of Ralph Hilgers and Raymond Hilgers, Petitioners-Appellants.**

Gen. No. 51,701.

First District, First Division.

October 9, 1967.

Sherman & Lewis, of Chicago (Irving S. Abrams and Maurice L. Lewis, of counsel), for appellants.

Gregory A. Gelderman, pro se, of Chicago, special administrator of respondent-appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

Petitioners, Ralph Hilgers and Raymond Hilgers, appeal from an order of the Probate Division of the Circuit Court, which denied their petition to be declared the owners of stock which stood in the name of the decedent at the time of his death. Petitioners claim that the decedent purchased the stock with funds which came from their grandmother as a gift to them.

Howard R. Habel, the maternal uncle of the petitioners, died on March 27, 1965, leaving a will dated May 12, 1961,

which was admitted to probate. Petitioner Raymond Hilgers and Frank F. Pipal were named as coexecutors. Included in the inventoried assets of the estate were 200 shares of Standard Kollsman common stock. The instant petition alleged that the decedent purchased this stock with funds which came from a joint savings account which stood in the name of their grandmother and the decedent (her son), with instructions from the grandmother to the decedent to deliver the proceeds of the account to the petitioners. At the hearing of the petition, the estate was represented by Gregory A. Gelderman as "special administrator." The evidence of petitioners consisted of the testimony of Ethel Hilgers, sister of the decedent and mother of the petitioners, and Raymond Hilgers, and a number of exhibits. No evidence was offered on behalf of the estate. The court entered an order denying and dismissing the petition.

Raymond Hilgers testified that after the death of the decedent, he went to decedent's home and among decedent's papers he found five savings account books (Exhibits 1 to 5) and a document in decedent's handwriting (Exhibit 6), all of which were received in evidence.

The savings account books (Exhibits 1 to 5) were: No. 1, a Bell Savings and Loan Association account established July 1, 1959, in the name of "Florence A. Habel or Howard Habel," balance $8,000; No. 2, a Bell Savings account established March 1, 1962, in the name of "Howard R. Habel," balance $8,000; No. 3, a Belmont-Central Savings and Loan Association account established April 25, 1957, in the name of "Florence Habel and/or Howard R. Habel," balance $6,502.50; No. 4, a Belmont-Central savings account No. 31860, established February 23, 1962, in the name of "Howard Habel or Raymond Hilgers," initial deposit being $2,250; No. 5, a Belmont-Central Savings account No. 31861, established February 23, 1962, in the name of "Howard Habel or Ralph Hilgers," with the initial deposit being $2,250. Exhibit 6 was a document in

the handwriting of the decedent, dated November 15, 1963. It itemized decedent's assets and included as item 6 "Stocks in Standard Kollsman." At the end of the list of assets was the following declaration in the handwriting of the decedent: "The Standard Kollsman and H. M. Bulsby Stock are to go to Ray and Ralph (Used Grandma's Money to Purchase)."

Mrs. Ethel Hilgers testified that she was a sister of the decedent and the mother of the two petitioners, Raymond and Ralph. At the time of the death of her mother (January 30, 1962), there was a savings account in the Bell Savings and Loan Association in the name of "Florence A. Habel or Howard Habel, as joint tenants with the right of survivorship," (Exhibit 1), and a savings account in the Belmont-Central Savings and Loan Association in the name of "Florence Habel and/or Howard R. Habel," (Exhibit 3). The money deposited in both accounts was her mother's money.

Mrs. Hilgers further testified that in February 1962, shortly after her mother's death, her brother, Howard Habel, came to her and told her he had the two bank books and he was going to do "as she [his mother] said he should do. He said: the money in the Bell Savings was to go to his use as long as he lived. The money in the Belmont Bank was to go to the boys and paying of her funeral expenses. At that time we went to the bank and he put the money in the boys' names. I went with him at the time that he opened up the accounts at the Belmont Bank. The accounts were opened in both his and each one of the boys' names. I was present when this was done. Petitioners' exhibits 4 and 5 for identification are the books that were given to me at that time." Some time later he said the money could make more on something other than bank interest, and he suggested buying "Standard Kollsman stock," where one of her sons was employed. She stated petitioners' Exhibit 6 was in her brother's handwriting and bore his signature.

On cross-examination, Mrs. Hilgers testified she never discussed money matters with her mother, and "I knew she had money in both those savings accounts, but my brother came to me and he told me what her wishes were, after she passed away." As to the Belmont-Central bank account, her brother said "that money was for the boys and to pay the funeral expenses, and some other expenses like headstones and things like that," and that is what the account was used for. She was present when the two joint accounts were opened for her sons, and the books "were kept in Howard's possession," and were in his possession when he died. He told her "he was buying Standard Kolls, the boys' share of it." The stock was in his name and in an account at a broker's office, which was never changed over. She did not know why it was not changed over to the boys, and "he left that note in with his belongings that it was the boys'."

Also received in evidence was a photostatic copy of the stock record of Howard R. Habel with Dean Witter and Co. This statement shows the purchase of 200 shares of Standard Kollsman stock on June 8, 1962, at a price of $21 per share, at a total cost, including commission, of $4,256. A payment of $4,256 was received on June 11, 1962. Exhibits 4 and 5, the Belmont-Central joint account books of the decedent and the petitioners, show withdrawals of $2,031.80 from each of the accounts on June 30, 1962, a total of $4,063.60. The statement shows the 200 shares were delivered under date of June 22, 1962.

Petitioners contend that the money deposited on February 23, 1962, in the Belmont-Central Savings and Loan Association accounts was a gift to them by their grandmother, and that the Standard Kollsman stock was purchased with money that came from these accounts, and a resulting trust of the stock arose in their favor.

The special administrator contends that the petitioners failed to show by clear and convincing evidence that their grandmother, Florence Habel, made a gift to them of the

funds on deposit in said joint account, in the names of herself and son, Howard Habel; that failing to do so, Howard Habel could not become a trustee of the funds for the petitioners; that the 200 shares of stock in Standard Kollsman purchased by Howard Habel on June 8, 1962, belonged to him during his lifetime and became a part of his estate upon his death, and that the trial court was correct in so holding.

After considering the theories and supporting authorities offered by both sides, we believe the guidelines to be used are found in the "joint account" and "resulting trust" pronouncements of our Supreme Court.

As to "joint accounts," in Murgic v. Granite City Trust & Savings Bank, 31 Ill2d 587, 202 NE2d 470 (1964), it is said (p 590):

> "It is implicit in Wubbena that a prima facie presumption of donative intent exists where the proof shows that the making of the deposit and the execution of the contract is in conformity with the statute. As we stated in recognizing the increased use of joint tenancy accounts and legislative relaxation of rules pertaining to them: 'Public policy would seem to require the adoption by the courts of a more liberal and practical view of these common transactions.' (Frey v. Wubbena, 26 Ill2d 62, 66.) The legislative policy to treat the joint account as a useful technique for transferring intangibles dictates that the estate or other person claiming against the survivor should have the burden of disproving intent on the part of the decedent, and the degree of proof required to void the presumption should be clear and convincing. This would add certainty to the law and at the same time protect a depositor's estate where the joint account was created without donative intent, for example where the account was opened for the convenience of the depositor as in Schneider. To hold that a lesser degree is required or that the burden

199

shifted would tend to make every joint tenancy account suspect and would promote instability rather than stability of ownership. A personal representative of a deceased joint tenant should not be constantly faced with the risk of charges of mismanagement for failure to litigate each joint account to which it or his decedent was a party.

"We hold that an instrument creating a joint account under the statutes presumably speaks the whole truth; and, in order to go behind the terms of the agreement, the one claiming adversely thereto has the burden of establishing by clear and convincing evidence that a gift was not intended. This burden does not shift to the party claiming under the agreement."

█ Applying the foregoing principles to the original Belmont-Central account, and after taking into account the family relationship, the informal character of the arrangement, the acts and declarations against interest made by decedent to his sister after the death of their mother, we conclude that the evidence is clear and convincing that at the creation of this account the "donative intent" clearly expressed by Mrs. Habel to her son was that a gift of the account to the petitioners, her grandsons, was intended, subject to the payment of funeral expenses. No gift was intended by Mrs. Habel to her son, and he made no claim to the account. When the decedent took possession of the funds of the original Belmont-Central account, after the death of his mother, his subsequent actions indicated that he accepted the funds as a fiduciary, with an obligation arising out of the confidence reposed in him by his mother to faithfully follow her instructions. Consistent with the instructions of his mother, as decedent informed his sister, and in her presence, defendant simultaneously established new joint accounts in Belmont-Central, of equal amounts of $2,250,

200

with each of the petitioners. Although the record does not indicate the reason for the establishment of joint accounts by the decedent with his nephews, a legal interest then arose in the petitioners to the accounts. The evidence indicates that decedent used the balance of the original account for the payment of his mother's funeral expenses, approximately $1,500.

On direct examination, Mrs. Hilgers testified that the savings account books representing these two new accounts were then given to her. That was corroboration that the decedent was making no claim to the account but was following the instructions and donative intent of his mother, expressed when the original Belmont-Central account was established.

Considered next is decedent's purchase of the 200 shares of stock of the Standard Kollsman Company. Mrs. Hilgers testified that decedent suggested buying the Standard Kollsman stock in order to "make more on something other than bank interest." Petitioners contend that the funds used in purchasing the stock came from their Belmont-Central joint savings accounts and, therefore, a resulting trust arose in their favor in the stock.

■ Resulting trusts, as a rule, generally arise where one person furnishes the consideration and the title is taken in another. In Hanley v. Hanley, 14 Ill2d 566, 152 NE2d 879 (1958), it is said (p 571):

> "A resulting trust arises by operation of law and is founded on the presumed intent of the parties ascertained from their acts and attendant facts and circumstances, and usually comes into existence where one person furnishes the consideration, or an aliquot part thereof, for the purchase of property while the title is taken in the name of another . . . , and it arises, if at all, at the instant legal title is taken and vests. . . . Acts of the alleged trustee or equitable owner subsequent to the taking of title,

201

have no bearing upon the question of whether a resulting trust was raised. . . . To justify the declaration of such trust, the evidence must be clear, convincing and unmistakable. . . ."

As to resulting trusts, in 89 CJS 940, it is said:

"They are creatures of equity and are based on the equitable doctrine concerning consideration, the doctrine that valuable consideration and not legal title determines the equitable title or interest. . . .

"The doctrine of resulting trusts in all of its phases applies alike to personal and to real property. The trust may arise as to a part of the property or a part of the interest therein, and not as to the residue, according to the intent existing in each particular case."

On page 945:

"A resulting trust arises from, or is created by, the facts and circumstances of the transaction, which need not be the same in all cases; and in determining whether a resulting trust has been created, each case is to be decided on its own facts, and the doctrine of resulting trust will be applied wherever the facts are such as clearly to invoke its application. Among other situations a resulting trust has been held to arise where a person comes into possession and control of the property of another; where money is placed in the hands of one person to be delivered to another. . . ."

On page 948:

"Since, however, a resulting trust is designed to carry the presumptive intention of the parties into effect, not to defeat it, it must be consistent with the intention of the parties at the time of the ac-

202

quisition of the property and will not be presumed or implied unless taking all the circumstances together it is the fair and reasonable interpretation of their acts and transactions."

■ Also, in determining whether the requirements for a resulting trust are present, it is proper to take into account the family relationship of the parties and the informal character of their arrangement. Merschat v. Merschat, 1 Ill App2d 429, 437, 117 NE2d 868 (1954).

Granting there is a slight chronological variance between the dates of the purchase of the stock and the withdrawal of the funds from the joint accounts, we believe that the record reflects clear and convincing evidence that the purchase of the Standard Kollsman stock was made for the benefit of petitioners with the use of funds which decedent withdrew from the Belmont-Central joint savings accounts. This conclusion is buttressed by the testimony of Mrs. Hilgers that her brother advised the purchase of the stock and corroborated by Exhibit 6, in which the decedent stated that the stock was to go to "Ray and Ralph" and that he "Used Grandma's Money to Purchase."

■ We find that although the 200 shares of Standard Kollsman stock were placed in the name of the decedent, the decedent did not intend to assert ownership and a resulting trust in favor of petitioners arose at the time of the purchase of the stock. Therefore, the stock did not become part of decedent's estate and should be delivered to petitioners.

For the reasons given, the order of the Circuit Court is reversed and the matter is remanded to the Circuit Court with directions to take further proceedings consistent with the views expressed herein.

Reversed and remanded with directions.

BURMAN and ADESKO, JJ., concur.