UNITED STATES of America, Plaintiff,

v.

**105,800 SHARES OF COMMON STOCK OF FIRSTROCK BANCORP, INC.,** Defendant.

UNITED STATES of America, Plaintiff,

v.

**122,942 SHARES OF COMMON STOCK OF FIRSTROCK BANCORP, INC.,** Defendant.

UNITED STATES of America, Plaintiff,

v.

**49,032 SHARES OF COMMON STOCK OF FIRSTROCK BANCORP, INC.,** Defendant.

Nos. 92 C 20288–92 C 20290.

United States District Court, N.D. Illinois, W.D.

Aug. 11, 1993.

Keith Syfert, U.S. Attorney's Office, Rockford, IL, for plaintiff.

Gregory P. Guth, Richard D. Gaines, Holmstrom & Kennedy, Rockford, IL; Stephen A. Glickman, John M. Foley, Chuhak & Tecson; Robert M. Stephenson, Theodore T. Poulos, Cotsirilos, Stephenson, Tighe & Streicker, Ltd., Chicago, IL; Maurice H. Connelly, Bayonne, NJ; Michael N. Bledsoe, Bledsoe & Tuohy; George J. Murtaugh, Jr.; George N. Vurdelja, Jr.; Kevin M. Flynn, Coffield, Ungaretti and Harris; and Renan I. Sugarman, Fishman & Merrick, P.C., Chicago, IL, for defendants.

## *ORDER*

REINHARD, District Judge.

## INTRODUCTION

On October 4, 1992, the United States of America (government) brought three civil

forfeiture actions against various shares of common stock of FirstRock Bancorp, Inc. (FirstRock) pursuant to 18 U.S.C. § 981(a)(1)(C). The government seeks to forfeit property which constitutes proceeds traceable to a bank fraud in violation of 18 U.S.C. § 1344. FirstRock is a holding company for First Federal Savings Bank of Rockford, Illinois (First Federal).

James Leichter, James Shaw, Bradley Frericks, Zvi Fishbane, Sheila Powsner, Joel Pogolowitz, Robert Rubinstein, Dolores Jugo, Nathen Schwitzer, Susan B. Kirschner, Dennis Bragelman, Gus Boosalis, the Trustee for Robinson Engineering, Ltd. Profit Sharing Trust (Robinson Engineering) and Elite have filed motions to dismiss or for summary judgment of the government's forfeiture complaint and to vacate a prior *ex parte* order dated October 4, 1992, authorizing the immediate seizure of their FirstRock stock. The government has also filed a motion to strike claims and for entry of a default judgment against nonclaimants. Claimant Walter J. Luscy has filed a certification in opposition to the government's motion to strike.

This court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1345, 1355 (*See* Order Dated June 14, 1993) 825 F.Supp. 191. For purposes of this order only, the court will consolidate the three civil forfeiture actions and will address all pending motions to dismiss, motions for summary judgment, the government's motion to strike and its motion for entry of default judgment. The court's decision on the motion for default judgment against nonclaimants is contained in a separate consolidated order.

## FACTS

First Federal Savings and Loan Association of Rockford, Illinois ("Association") operated as a federally chartered mutual savings association owned collectively by all its depositors until 1992. Beginning in May 1992, the Association started converting to First Federal, owned directly by FirstRock and indirectly by FirstRock's shareholders.

The Office of Thrift Supervision (OTS) monitors the conversion of a mutual savings association to a capital stock associa-

tion in compliance with conversion regulations. *See* 12 C.F.R. § 563b (1993). The purpose of the conversion regulations is to provide an opportunity for existing depositors to continue ownership in the newly formed institution. Thus, pursuant to the regulations, existing depositors having accounts opened at a converting association on a specified date must have the right to purchase stock in the new institution before the stock is offered to the general public. *See generally* 12 C.F.R. § 563b.3(c) (1993). According to the regulations, no person shall transfer, or enter an agreement to transfer, the legal or beneficial ownership of conversion subscription rights, or the underlying securities to the account of another. *See* 12 C.F.R. § 563b.3 (1993).

The government alleges that First Federal allowed eligible Association depositors to purchase FirstRock stock before making this offer to the general public in accordance with the conversion regulations. Additionally, First Federal tried to prevent speculators from wrongfully acquiring stock during the conversion. For example, the prospectus accompanying all stock order forms distributed by FirstRock included several warnings:

**Restrictions on Transfer of Subscription Rights and Shares**

Prior to the completion of the Conversion, no person may transfer or enter into any agreement or understanding to transfer the legal or beneficial ownership of the subscription rights issued under the Plan or the shares of Common Stock to be issued upon their exercise. Each person exercising subscription rights will be required to certify that a purchase of Common Stock is solely for the purchaser's own account and that there is no agreement or understanding regarding the sale or transfer of such shares. See "The Conversion–Restrictions on Transfer of Subscription Rights and Shares."

The Company and the Association will pursue any and all legal and equitable remedies in the event they become aware of the transfer of subscription rights and will not honor orders known by them to involve the transfer of such rights.

\* \* \* \* \* \*

**Restrictions on Transfer of Subscription Rights and Shares**

Prior to the completion of the Conversion, the OTS conversion regulations prohibit any person with subscription rights, including the Employee Plans, Eligible Account Holders and Other Members of the Association, from transferring or entering into any agreement or understanding to transfer the legal or beneficial ownership of the subscription rights issued under the Plan or the shares of Common Stock to be issued upon their exercise. Such rights may be exercised only by the person to whom they are granted and only for his account. Each person exercising such subscription rights will be required to certify that he is purchasing shares solely for his own account and that he has no agreement or understanding regarding the sale or transfer of such shares. The regulations also prohibit any person from offering or making an announcement of an offer or intent to make an offer to purchase such subscription rights or shares of Common Stock prior to the completion of the Conversion.

The Association and the Company will pursue any and all legal and equitable remedies in the event they become aware of the transfer of subscription rights and will not honor orders known by them to involve the transfer of such rights.

Additionally, the subscription offering stock order form FirstRock provided to prospective purchasers contained a similar warning. (*See* Compl., Exh. B). Moreover, the stock order form which eligible depositors were required to sign stated, "Under penalty of perjury, I certify ... that I am purchasing shares solely for my own account and that there is no agreement or understanding regarding the sale or transfer of such shares, or my right to subscribe for shares herewith." (*See* Compl., Exh. B).

## BACKGROUND

In an affidavit attached to the complaint, Federal Bureau of Investigation (FBI) special agent Lon Christensen explains why speculators are interested in obtaining stock during the initial offering. If eligible deposi-

tors exercise their subscription rights to the extent that all stock is purchased, the general public cannot purchase stock in the initial offering and can only purchase stock once public trading in the stock commences. Past conversions have shown that once the stock is traded publicly, the price per share increases significantly shortly thereafter. Thus, a person who is not an eligible depositor in a converting association (a "speculator") has a financial incentive to convince eligible depositors to purchase stock on behalf of the speculator.

Pursuant to the conversion process, FirstRock offered its available stock for sale until 12:00 p.m. on Thursday, September 24, 1992. The conversion closed on October 2, 1992. At that time, FirstRock issued shares to eligible Association depositors who had submitted stock order forms. The government alleges that included among that group were depositors illegally acting on behalf of speculators engaged in a scheme to obtain FirstRock shares through false and fraudulent representations. A federal criminal investigation was initiated during the final days of the FirstRock conversion and included the use of an undercover FBI agent who posed as an eligible First Federal depositor, "Brian T. Grant."

### *122,942 shares (No. 92 C 20288)*

Christensen outlines what the undercover FBI agent discovered when the agent posed as "Grant." On September 23, 1992, "Grant" received a telephone call from a person identifying himself as Jim Shaw. Shaw asked "Grant" if he had a checking or savings account at First Federal. When "Grant" answered affirmatively, Shaw said he would wire money to "Grant's" checking account so that "Grant" could then write a check to First Federal. Shaw told "Grant" he wanted "Grant" to buy $200,000 of First Federal stock. Later that same day "Grant" met with Shaw and another person (later identified as Leichter). Shaw, in the presence of Leichter, executed a FirstRock Subscription Offering Stock Order Form. Shaw required "Grant" to sign the form as well as two irrevocable stock power forms and two forms regarding stock certificates registered in

names other than that of an account. (*See* Compl., Exh. C–3, D–1 to D–5). During their conversation, Shaw told "Grant" he would be dealing with Shaw's partner, Brad Frericks, in the future.[1]

Shaw told "Grant" that when "Grant" received the stock, Shaw should get it immediately. When "Grant" asked about the "under penalty of perjury" certification on the stock order form, Shaw told him it was a trick. "Grant" was also told if anyone asked, "Grant" was to say he was purchasing the stock for himself. At the end of the meeting, Shaw, in Leichter's presence, gave "Grant" $500 in cash. "Grant" was to receive an additional $1,000 when the stock issued. Subsequently, Frericks told "Grant" $150,000 would be wired into his account at First Federal. In fact, the government alleges a total of $151,500 was wired into "Grant's" account from various sources.

Shaw admits he and Frericks, operating through SCI, entered written agreements similar to the one described above with four other First Federal depositors: Kevin Drew, Cory Church, Trent Johnson and Ellen Steinhagen. These agreements were entered into and executed between September 17 and September 24, 1992. Under the terms of the agreements, SCI agreed to loan each depositor funds ranging from $151,000 to over $211,000. The depositors were to use the funds to purchase FirstRock stock in accordance with their subscription rights. Shaw and Frericks have filed verified claims to 101,782 shares of defendant property in *122,942 shares*.[2]

The government also interviewed Steven Pierce on October 2, 1992, whose former brother-in-law is Leichter. According to Pierce, he and Leichter agreed that Pierce would purchase stock. Because Leichter was providing the money, they "set it up" so that Leichter would be acting as trustee over the stock and Pierce would have the beneficial interest. Pierce thought the transaction would involve 100 to 200 shares. He stated he signed the forms (described above) before they were filled out. When the FBI showed Pierce the stock order form, he noted it was for 20,000 shares for $200,000. According to Pierce, that was the first time he saw the completed forms and "in no way" did he have $200,000. Leichter has filed a verified claim to 21,160 shares of defendant property in *122,942* shares.

Zvi Fishbane, Sheila Powsner, Nathen T. Schwitzer, Joel Pogolowitz, Robert S. Rubinstein, Dolores Jugo and Walter Luscy have filed verified claims to defendant property in *122,942 shares*. According to their verified claims, each claimant invested a sum of money with Norman Beckoff or Brett Brandes.[3] Brandes or Beckoff then invested each claimant's money with Frericks, Shaw and/or SCI, who then allegedly used the funds to purchase FirstRock stock. Each claimant asserts he or she has a valid interest to the extent of the value of the amount invested in the shares of stock.

### *105,800 shares (No. 92 C 20289)*

In *105,800 shares*, Christensen recounts a similar scheme between Hamilton Investments,[4] Broadmoor Insurance Agency and the following eligible First Federal depositors: Karen M. Naramore, Tamara Stone, Jennifer Streit, and Michelle Teeters. (*See* Compl., Exh. A, at 8–19). Christensen also recounts that an eligible First Federal depositor, Dennis Bragelman, allegedly obtained funds to purchase FirstRock stock from John—(last name unknown), the owner of North Water Produce.[5]

---

1. Shaw and Frericks are partners in an investment firm known as Sterling Capital Investments (SCI).

2. Shaw and Frericks are acting jointly in the present dispute. For simplicity, hereinafter the court will refer only to Shaw but intends reference to both.

3. Each claimant gave the following: Fishbane—$50,000; Powsner—$40,000; Schwitzer—$50,-000; Pogolowitz—$30,000; Rubinstein—$75,-000; Jugo—$50,000; Luscy—$10,000.

4. The representatives of Hamilton Investments were later identified as Paul Svigos and Marty Flanagan of Chicago, Illinois.

5. The FBI subsequently determined that John—is John Svigos, the brother of Paul Svigos, who was involved in the purchase of stock in the names of Naramore, Stone, Streit and Teeters.

Bragelman has filed a verified claim to 21,160 shares of defendant property in *105,-800 shares*. Robinson Engineering has also filed a verified claim to 21,160 shares.[6] In its verified claim, Robinson Engineering states that it tendered $211,600 to Hamilton Investments. Hamilton Investments then used this sum to purchase the shares of stock which are the subject of this forfeiture action. Susan B. Kirschner has also filed a verified claim to 21,160 shares of defendant property in *105,800 shares*. In her verified claim, Kirschner states she loaned $211,600 to eligible First Federal depositor Karen Naramore on September 24, 1992, and the subject shares were pledged to Kirschner as security for the loan.

Gus W. Boosalis also filed a verified claim to 42,320 shares of defendant property in *105,800 shares*. Boosalis asserts he is owner of these shares but does not state how he acquired this status. However, in his statement of facts filed with his motion for summary judgment, Boosalis elaborates as to how he is the "owner" of 42,320 shares. According to Boosalis, he forwarded $421,000 to a Merrill Lynch broker, Paul Savigos (presumedly Paul Svigos), for investment in FirstRock stock through Marty Flanagan III of Hamilton Investments. Flanagan then created a stock pledge transaction between Teeters, Streit and Boosalis.

### 49,032 shares (No. 92 C 20290)

In *49,032 shares*, Christensen outlined a similar scheme between Elite and the following eligible First Federal depositors: Timothy Elliott, Roderick Malone, Holly Suddarth and Patrick L. Suddarth.[7] Elite has filed a claim for 49,032 shares. In its claim, Elite states the loan agreements and powers of attorney between itself and Elliott, Malone and the Suddarths grants Elite an interest in the stock.

On October 4, 1992, when the government initiated the present forfeiture actions, it also filed an *ex parte* motion to request a judicial determination of probable cause based on each complaint and accompanying affidavit. That day, after reviewing each complaint and affidavit, Magistrate Judge P. Michael Mahoney entered a finding of probable cause that the defendant property was subject to forfeiture and ordered the United States Marshal to seize the defendant property and give notice of the seizure. Magistrate Judge Mahoney also ordered FirstRock to halt transfer of the defendant property and deliver the stock certificates to the U.S. Marshal.

### CONTENTIONS

Various claimants contend the following: (1) FirstRock was not "deceived" within the meaning of the bank fraud statute because of information found on the face of the stock order form; (2) FirstRock was not "deceived" within the meaning of the statute because it had information as a result of its involvement in the government's "sting" investigation; (3) given the nature of volatile publicly-traded security, the seizure of defendant property is not appropriate; (4) with respect to Trent Johnson, the complaint fails to allege any specific facts establishing a preconversion illegal agreement; (5) violation of OTS regulation 12 C.F.R. § 563b.3(i) is a prerequisite to a violation of section 1334 and the various agreements executed between claimants and depositors do not violate the OTS regulation; (6) the alleged scheme to defraud did not expose FirstRock to a risk of loss nor otherwise threaten the financial integrity of the institution; (7) the stocks issued by FirstRock were not "owned by or in the custody or control of a financial institution" within the meaning of section 1344; (8) the shares issued to the depositors are not "proceeds" within the meaning of the statute. Several claimants also assert an "innocent owner" defense. *See* 18 U.S.C. § 981(a)(2).

6. In its verified claim, Robinson Engineering does not claim a certain number of shares of defendant property. Rather, Robinson Engineering asserts a claim in the defendant property to the extent of the sum of $211,600. The court assumes the $211,600 was used to purchase 21,160 shares.

7. Although the Suddarths refused to recount where they obtained financing for their purchase of stock, the FBI has determined that their stock order forms direct that the stock certificates be delivered to a Charles Schwab office. There is evidence linking the Charles Schwab office to Elite.

The government contends certain claimants lack standing to contest the forfeiture in the instant case. Alternatively, the government asserts it need not prove a violation of section 563b.3(i) of the OTS regulations to prove a violation of section 1344(2).[8] The government also asserts it has sufficiently pled bank fraud in violation of section 1344(2) for purposes of a motion to dismiss. Additionally, the government contends Magistrate Judge Mahoney's finding of probable cause is sufficiently supported by the verified complaint and accompanying affidavit. Moreover, the government argues that seizure and forfeiture of the defendant property is statutorily authorized and constitutionally permissible.

## I. Standing

■ The government contends the interests of certain parties who have filed motions to dismiss are insufficient as a matter of law to create cognizable claims. The government concludes that in the absence of legally protected interests in the seized shares these claimants lack the standing to contest the present forfeiture actions. Because standing is a threshold issue and fundamental to a court's subject matter jurisdiction, this court will address the standing issue first. *See United States v. $38,000.00 in United States Currency,* 816 F.2d 1538, 1543 (11th Cir. 1987).

■ The Seventh Circuit notes there are two forms of standing in a forfeiture case: Article III standing and statutory standing. *See United States v. U.S. Currency, in the Amount of $103,387.27,* 863 F.2d 555, 560 n. 10 (7th Cir.1988). The court disagrees with the government's broad assertion that claimants to property seized pursuant to section 981 must prove they are owners or lienholders to establish Article III standing.[9] Rather, to contest a forfeiture, a claimant must first show a sufficient interest

in the property to give him Article III standing. *In the Amount of $103,387.27,* 863 F.2d at 560 n. 10. A claimant need not prove the merit of his underlying claim but must be able to show "at least a facially colorable interest in the proceedings" sufficient to satisfy Article III. *$321,470.00,* 874 F.2d at 302; *see also United States v. One 18th Century Colombian Monstrance,* 797 F.2d 1370, 1375 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987). Once that hurdle is met, a claimant must satisfy the procedural rules of the Supplemental Rules for Certain Admiralty and Maritime Claims (Admiralty Rules) to establish statutory standing. A claimant bears the burden of establishing standing. *United States v. $321,470.00, U.S. Currency,* 874 F.2d 298, 302 (5th Cir.1989); *United States v. $38,000.00 in U.S. Currency,* 816 F.2d 1538, 1543 n. 11 (11th Cir.1987).

■ At issue in the present dispute is whether certain claimants have Article III standing. The government has brought this action pursuant to the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C) (West Supp.1993), which authorizes the United States to subject to forfeiture, "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section ... 1344 of this title[.]" A claimant in a forfeiture case has Article III standing if "he has a legally cognizable interest in the property that will be injured if the property is forfeited to the government. It is this claim of injury that confers upon the claimant the requisite 'case or controversy' standing to contest the forfeiture." *$38,000.00 in U.S. Currency,* 816 F.2d at 1543–44 n. 12. Thus, courts have held that possession of legal title only with no authority to exercise dominion and control over the property does not confer standing to challenge a forfeiture. *United States v. One Parcel of Land, Known as Lot 111–B, Tax*

---

8. Alternatively, the government argues it has proved a violation of 12 C.F.R. § 563b.3(i) (1993).

9. The government relies on *United States v. One 1987 Cadillac DeVille,* 774 F.Supp. 221, 223 (D.Del.1991) for this statement. However, *One 1987 Cadillac DeVille* merely stands for the proposition that a claimant seeking to invoke the

innocent owner defense must be an owner or lienholder. That is a separate inquiry from the issue of whether a claimant has Article III standing. To the extent *One 1987 Cadillac DeVille* merges the issue of Article III standing with the issue of whether a claimant may invoke the innocent owner defense, the court declines to adopt its reasoning.

*Map Key 4-4-03-71(4), Waipouli, Kapaa, Hawaii,* 902 F.2d 1443, 1444 (9th Cir.1990); *United States v. 526 Liscum Dr.,* 866 F.2d 213, 217 (6th Cir.1988). Conversely, a property interest less than ownership, such as a possessory interest, may be sufficient to confer standing. *See United States v. Currency $267,961.07,* 916 F.2d 1104, 1106 (6th Cir. 1990); *see also United States v. One Rural Lot,* 739 F.Supp. 74, 77 (D.P.R.1990) ("[t]he term ownership interest has been liberally construed to encompass any person with a recognizable legal or equitable interest in the seized property."). The court must analyze the standing of the following "claimants": Leichter, Shaw, the Fishbane claimants; [10] Kirschner; Robinson Engineering; Boosalis; and Elite.[11]

### A. Leichter

On the Subscription Offering Stock Order Form for Steven Pierce, James Leichter is listed as the person in whose name the stock is to be registered. (*See 122,942 shares* Compl., Exh. C-5). Purportedly, Leichter was acting as Pierce's trustee. The government notes Pierce has failed to file his own claim to the defendant property. The government asserts Leichter has failed to indicate he is filing the claim as trustee for Pierce, has failed to attach the agreement purportedly establishing his role as Pierce's trustee, and has failed to assert the claim is authorized by Pierce. The government also notes Pierce has disavowed the stock order. (*See 122,942 shares* Compl., at 16-17). The government, in essence, challenges the trustee arrangement. However, this is a factual issue and cannot properly be decided on a motion to dismiss.

For purposes of a motion to dismiss, all well-pleaded allegations are accepted as true. In the affidavit attached to the complaint, Christensen recounts Pierce's statement regarding the transaction at issue, wherein he describes Leichter as trustee over the stock and Pierce as having the beneficial interest. Additionally, following Leichter's name on Pierce's stock order form is the acronym, "TTEE." Thus, the pleadings sufficiently reflect a trust establishing Leichter as trustee for Pierce for purposes of this motion and it is irrelevant, for purposes of a motion to dismiss, that Leichter has failed to attach a copy of the trust agreement.[12]

It is basic to the law of trusts that a trustee may represent a beneficiary in all actions relating to the trust when the beneficiary's rights as against the trustee or the rights between beneficiaries are called into question. *See United States v. 120 Beacon St.,* No. 85-2787-2, 1987 WL 20225, at *1 (D.Mass. Nov. 6, 1987). Unproven allegations of a "sham" trust do not eviscerate Leichter's standing based on his status as record owner of the stock as Pierce's trustee. *120 Beacon St.,* No. 86-2787-2, 1987 WL 20225, at *1.

### B. Shaw

The government argues the option agreements do not confer standing on Shaw. This is so, the government argues, because any interest SCI may have had in the shares before exercising its options is a mere expectation. The government concludes that a future expectation of ownership is insufficient to confer standing on a claimant and relies on *United States v. R.R. 2,* 790 F.Supp. 200, 202 (N.D.Iowa 1991), *aff'd,* 959 F.2d 101 (8th Cir.1992). Shaw argues it is the very existence of the written agreements between SCI and each depositor which gave rise, in part, to the instant forfeiture. While these agreements merely granted SCI an option to purchase the stock, Shaw argues

---

10. For simplicity, the court will refer to Zvi Fishbane, Sheila Powsner, Nathen T. Schwitzer, Joel Pogolowitz, Robert S. Rubinstein, and Dolores Jugo as "the Fishbane claimants." The court also includes Schwitzer in this category. Although he has retained a separate attorney, Schwitzer stands in the same position. Walter Luscy is not included in this group because he has not timely filed a verified claim, as the government notes. Luscy's problem with statutory standing is addressed in a separate order regarding the government's motion for an entry of default.

11. The government does not contest claimant Bragelman's Article III standing.

12. Leichter's verified claim also discloses his purported status as trustee for Pierce.

that this expectation, when coupled with the funds SCI loaned to each depositor, confers Article III standing on Shaw.

The court agrees with Shaw. The written agreements and the exchange of money between SCI and the depositors lies at the heart of the government's claimed violation of section 1344.[13] The court finds *R.R. 2*, which involved a child's future ownership expectation, inapposite. The nature of the statute at issue coupled with the extent of Shaw's involvement in the alleged scheme which gave rise to the present forfeiture dispute indicates Shaw has a sufficiently colorable interest in the proceedings to satisfy Article III.[14]

### C. The Fishbane Claimants

■■■ The Fishbane claimants seek to invoke the "innocent owner" defense under 18 U.S.C. § 981(a)(2) (West Supp.1993), which states: "No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder." Thus, under the clear language of the statute, to have standing the Fishbane claimants must be owners or lienholders of defendant property. *See United States v. One 1987 Cadillac DeVille*, 774 F.Supp. 221, 223 (D.Del.1991).

■■■ None of the claimants have brought forth any evidence nor alleged the existence of any type of security agreement between themselves and Beckoff or Brandes which would elevate the claimant to the status of secured creditor. Thus, each Fishbane claimant is, in essence, an unsecured creditor. It is well-established that general unsecured creditors do not have standing to contest the forfeiture of their debtor's property. *See, e.g., United States v. 127 Shares of Stock*

in *Paradigm, Mfg.*, 758 F.Supp. 581, 583 (E.D.Cal.1990) and cases cited therein.

■■■ Claimant Schwitzer further argues Fed.R.Civ.P. 19 mandates his presence in the instant case. Specifically, Schwitzer argues he loaned $50,000 to SCI, which was used to purchase defendant property. If he is not allowed to intercede in the present case, Schwitzer argues, he will be irrevocably damaged. Rule 19 permits a party to be joined if the person claims an interest in the action and is so situated that disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest. Rule 19 presupposes the person has Article III standing to protect an "interest." In the instant case, Schwitzer's interest is limited to the $50,000 he invested with a third party, who invested with SCI, which then became involved in a scheme to purchase FirstRock stock. The court finds Schwitzer's interest in his $50,000 is insufficient to mandate his presence in this dispute. The defendant property consists of FirstRock stock. Schwitzer apparently played no role in the alleged bank fraud which revolves around the defendant property. He had no knowledge of the entire alleged scheme until after the government seized the FirstRock stock, nor did he know his money was going to be invested in SCI. The court finds the remaining procedural rules cited by Schwitzer to be inapposite in the instant case. The Fishbane claimants do not have standing to contest the present forfeiture action. The government's motion to strike is granted as to these claimants, and the claimants' motion to dismiss is denied for lack of standing.[15]

### D. Kirschner

Karen Naramore is an eligible First Federal depositor. On September 24, 1992, Nar-

13. At the very least, the agreements give rise to a resulting trust with SCI as beneficial owner of the stock. *See infra* section I(D).

14. Shaw also argues SCI's exercise of the options on October 19, 1992, created a sufficient equitable ownership interest in the stock. However, as the government notes, title vests in the government on the date of seizure. *See United States v. Rod and Reel Fish Camp*, 660 F.Supp. 483, 487 (S.D.Miss.1987). Thus, SCI was barred

from acquiring a legally cognizable interest in the property after seizure.

15. These claimants may have a cause of action against those who they dealt with and persons causing any loss. Moreover, if these claimants are victims of a fraud, they may seek remission and mitigation of the forfeiture. 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9.

amore purchased 21,160 shares of FirstRock stock using funds provided by Susan Kirschner. (*See 105,800 shares* Compl., at 11). Kirschner admits the purpose of the loan was to enable Naramore to purchase the FirstRock stock. Kirschner was told Naramore had executed loan agreement documents, including a promissory note and a pledge agreement, by which Naramore agreed to pledge the FirstRock stock as security for the Kirschner loan. The loan transaction was arranged by Kirschner's securities investment broker for Hamilton Investments. After Kirschner tendered the check for $211,600 to Naramore on September 24, 1992, Naramore endorsed the check and deposited it into her checking account at First Federal. Naramore then drew a check for the same amount from this account, payable to FirstRock, to purchase FirstRock stock.

The government has appended a pledge agreement to its complaint (*see 105,800 shares* Compl., Exh. D–1) which Kirschner argues is a replica of the pledge agreement entered into between herself and Naramore.[16] The pledge agreement provided: Kirschner was to be granted a security interest under the Illinois Uniform Commercial Code (UCC) in the FirstRock stock; Naramore was the sole and absolute owner of the shares and share certificates; and, Kirschner was the beneficial owner of the shares.

◼ Initially, Kirschner argues the government's motion to challenge her standing was filed more than six months after Kirschner filed her claim and is not timely. According to Kirschner, Fed.R.Civ.P. 12 requires all defenses and affirmative defenses to be raised within 20 days after filing a counterclaim. Kirschner's argument is inapposite as the government is not asserting Kirschner's standing (or lack of) as an affirmative defense. Rather, the government asserts her lack of standing as grounds for dismissal for want of subject matter jurisdic-

tion. As such, the government's motion to dismiss is timely. Kirschner also appears to invoke general equitable principles by arguing the government should not be allowed to challenge her standing at this stage, after Kirschner has attended hearings and engaged in discovery. The court rejects this argument. Subject matter jurisdiction is paramount to this court's power, and a challenge to such jurisdiction may be made by any party to a lawsuit at any time, or may even be raised *sua sponte* by the court. A party may *never* "waive" subject matter jurisdiction. For the reasons set forth above, the government's motion to dismiss Kirschner due to her alleged lack of standing is timely.

◼ The government argues the pledge agreement between Kirschner and Naramore superficially suggests Kirschner acquired a security interest in the stock Naramore purchased. The government asserts no security interest was created under Illinois law.[17] The court need not address this issue. The court finds persuasive Kirschner's argument that a resulting trust should be imposed on the FirstRock stock, rendering Kirschner a beneficiary owner with standing to contest the present forfeiture.

◼ The government posits a resulting trust is inapplicable in the instant case because the equitable doctrine applies only to real property. The court disagrees. A resulting trust is created by operation of law, *Suwalski v. Suwalski*, 40 Ill.2d 492, 240 N.E.2d 677 (1968), where one person purchases property with his own funds but title is taken in the name of another. *In re Wilson's Estate*, 81 Ill.2d 349, 43 Ill.Dec. 23, 410 N.E.2d 23 (1980). Whether a resulting trust arises depends on the intention of the person furnishing the purchase price at the time of the conveyance. *Gary–Wheaton Bank v. Meyer*, 130 Ill.App.3d 87, 90–91, 85 Ill.Dec. 180, 183, 473 N.E.2d 548, 551 (2d

---

**16.** Kirschner has not submitted a copy of a pledge agreement bearing the signature of Naramore or Kirschner. However, for purposes of this motion, the court will accept as true that Naramore and Kirschner entered into a pledge containing the exact language found in the agreement attached to the government's complaint.

**17.** The court agrees with the government that it is proper to use state law in defining the property interest at issue. *See United States v. 5854 North Kenmore*, 762 F.Supp. 204, 209 (N.D.Ill.1991) (in civil forfeiture actions, property issues concerning ownership are governed by the laws of the state where the property is located).

Dist.1984). The party seeking to establish such a trust must do so by clear and convincing evidence. *Nickoloff v. Nickoloff,* 384 Ill. 377, 51 N.E.2d 565 (1943). The most common situation wherein a resulting trust is imposed involves real property. *Carlson v. Carlson,* 74 Ill.App.3d 673, 675, 30 Ill.Dec. 607, 609, 393 N.E.2d 643, 645 (1st Dist.1979). However, Illinois law does not limit imposition of a resulting trust to real property. For example, in *In re Estate of Habel,* 88 Ill.App.2d 194, 201–02, 231 N.E.2d 616, 620 (1st Dist.1967), the First District imposed a resulting trust on stock purchased with funds obtained from a joint savings account. *See also, e.g., Alexander v. Mermel,* 27 Ill.App.2d 281, 169 N.E.2d 569 (1st Dist.1960) (imposing a resulting trust on U.S. Savings Bonds or their proceeds).

 The agreement discloses that Kirschner purchased the FirstRock stock with her funds but title was taken in Naramore's name. There is abundant evidence in the verified complaint that Naramore purchased the stock with Kirschner's money and expected no further involvement. Her only motivation for her limited involvement was the promise of a tidy sum for her troubles. The security agreement, coupled with the government's complaint, unequivocally indicates the parties' intent that Naramore was purchasing the stock for Kirschner's benefit. The court finds the parties' conduct gives rise to a resulting trust. Therefore, Kirschner is the beneficial owner of the FirstRock stock ,at the time of the forfeiture and, as such, has standing to contest the present forfeiture action. *See United States v. Santoro,* 866 F.2d 1538, 1545 (4th Cir.1989) (holding that the beneficial owner of an express trust has standing to contest the forfeiture action); *United States v. 717 Woodard St.,* 804 F.Supp. 716, 725–26 (E.D.Pa.1992) (beneficiary of a resulting trust has standing

to contest forfeiture action).[18] The court notes public policy does not preclude it from imposing a resulting trust in the instant case, *see, e.g., In re Torrez,* 827 F.2d 1299, 1302 (9th Cir.1987) (recognizing that one who attempts to defraud the government cannot seek to enforce a resulting trust in his favor), because Kirschner seeks to invoke the "innocent owner" defense.

## E. Robinson Engineering

 Robinson Engineering also urges the court to impose a resulting trust on the stock purchased by Tamara Stone and declare Robinson Engineering a beneficial owner of said stock. In so arguing, Robinson Engineering asserts it loaned Stone $211,600 to purchase the defendant property. Neither its verified claim nor the government's complaint support this assertion. In its verified claim, Robinson Engineering states it tendered $211,600 to Hamilton Investments. Robinson Engineering also states Hamilton Investments then used these funds to purchase FirstRock stock. Yet, Robinson Engineering has failed to show several key elements. First, Robinson Engineering has failed to show it intended for Hamilton Investments to use Robinson Engineering's tendered money to purchase FirstRock stock. Second, Robinson Engineering has failed to show that it tendered its money before Hamilton Investment purchased the stock. *See Leicht v. Quirin,* 200 Ill.App.3d 1057, 1062–63, 146 Ill.Dec. 752, 755, 558 N.E.2d 715, 718 (5th Dist.1990). Third, Robinson Engineering has failed to establish the requisite connection between Hamilton Investment and Tamara Stone. The government's complaint does not show from whom Stone received the money to purchase shares.[19]

18. The court makes no finding with respect to whether the UCC has preempted the equitable doctrine of resulting trusts, as neither side as raised this issue. *Compare Small v. Beverly Bank,* 936 F.2d 945, 950 (7th Cir.1991) (equitable lien theory should not be allowed to frustrate the Bankruptcy Code policy) *with General Ins. Co. v. Lowry,* 570 F.2d 120, 122 (6th Cir.1978) (equitable lien does not conflict with Article 9 of UCC).

19. Even if the same form of agreement was used in the Kirschner/Naramore transaction, the Robinson Engineering/Stone transaction and the Boosalis/Teeters and Streit transaction, the court is not inconsistent in finding only Robinson Engineering presently has not established Article III standing. A resulting trust depends on the parties' intent, and Robinson Engineering has not proven the requisite intent for purposes of a resulting trust.

**1120**

Alternatively, Robinson Engineering argues it should be treated as a secured creditor under the UCC, and then it would have standing to contest the present forfeiture action.[20] According to the government, a security interest in certified shares of stock can only attach if the secured party or a representative has possession of the stock certificates or the debtor has signed a security agreement containing a description of the security. See 810 ILCS 5/8–321(1), 5/8–313(1)(i) (1993) (formerly ILL.REV.STAT. ch. 26, ¶¶ 8–321(1), 8–313(1)(i) (1991)). The government asserts that it is impossible to determine whether Robinson Engineering was the intended beneficiary of the pledge agreement because the documents at issue were signed in blank and did not identify the "pledge" to whom the purported security interest was granted. Moreover, the pledge agreement is devoid of any description of the stock. The absence of a description is fatal, according to the government, because pursuant to Illinois law a lien will not attach absent such a description. See 810 ILCS 5/8–321(1), 8–313 (1993) (formerly ILL.REV.STAT. ch. 26, ¶¶ 8–321(1), 8–313 (1991)).

The government also contends that even if a lien did attach to the defendant property, the lien is no longer perfected. In so arguing, the government notes 810 ILCS 5/8–321(2) (1993) (formerly ILL.REV.STAT. ch. 26, ¶ 8–321(2) (1991)) wherein it states that without possession of the stock certificate, the security interest remains perfected only for twenty-one days unless reregistration of the stock occurs within that period. No such reregistration has been alleged here, the government notes, and absent that step, Robinson Engineering is nothing more than an unsecured creditor who lacks standing to contest the present forfeiture action.

 The court agrees that Robinson Engineering does not have a perfected security interest in the stock as defined by the UCC. Therefore, at best it occupies the position of an unsecured creditor, a position which is insufficient to confer Article III standing for purposes of this forfeiture action. The gov-

ernment is correct in noting the security agreement between Robinson Engineering and Stone contains an insufficient description. See 810 ILCS 5/9–110 (1993) (formerly ILL.REV.STAT. ch. 26, ¶ 9–110 (1991)) (any description of personal property is sufficient if it reasonably identifies what is described). The pledge agreement states the "Pledgor owns or will acquire ownership of the shares of stock indicated on Exhibit A attached hereto[.]" (See 105,800 Shares Compl., Exh. D–1). However, Exhibit A is blank. Robinson Engineering argues the lack of description should not prevent it from obtaining a perfected security interest because the government's intervening actions prevented Robinson Engineering from adequately describing the stock in its security agreement. However, Robinson Engineering admits the stock was not yet in existence when it executed the security agreement, and herein lies the problem.

 In order for a security interest to become attached and perfected, a transfer within the meaning of section 8–313(1) of the UCC must occur. 810 ILCS 5/8–321 (1993) (formerly ILL.REV.STAT. ch. 26, ¶ 8–321 (1991)); Jeanne L. Schroeder & David G. Carlson, "Security Interests Under Article 8 of the Uniform Commercial Code," 12 CARDOZO L.REV. 557 (1990). A security interest so transferred is a perfected security interest. However, implicit within sections 8–313 and 8–321 is that,

> [N]o party in this case can have acquired a security interest in shares of (certified) stock without having taken actual possession of the stock certificates. The district court reached the same conclusion. Although there is little case law on this point, the relevant decisions do seem to assume that physical delivery is necessary to create a secured interest in certified securities under the relevant provisions of Article 8.

FDIC v. W. Hugh Meyer & Assoc., 864 F.2d 371, 375 (5th Cir.1989); see also United States v. BCCI Holdings (Luxembourg), S.A., 822 F.Supp. 1 (D.D.C.1993) (under UCC § 8–321(1), a security interest in certified

**20.** The court agrees with the government and Robinson Engineering that it is proper to use state law in defining the property interest at

issue. See United States v. 5854 North Kenmore, 762 F.Supp. 204, 209 (N.D.Ill.1991).

stock can attach and become enforceable only if the certificate is possessed by the secured party, an agent thereof, or a bailee who has been notified of the secured party's interest). In other words, to be in possession of a security, the security must exist. *See Kaufman v. Diversified Indus., Inc.,* 460 F.2d 1331, 1334 (2d Cir.), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972); Schroeder & Carlson, *supra,* at 584 n. 104. Stone signed the security agreement on September 24, 1992, but the stock was not in existence at that time and was not issued until October 2, 1992. Moreover, the government seized the stock certificates before they reached Stone's hands. Thus, Stone has never taken physical delivery of the stock, and section 8–313(1) remains unsatisfied.

■ Additionally, a security interest in certified shares can be perfected only by rigorous compliance with section 8–313. Dickerson, *supra.* The first method of transfer is delivery of the certificate to the purchaser or a person designated by her. *See* 810 ILCS 5/8–313(1)(a) (1993). Stone never received the certificate. *See Schroeder & Carlson, supra* (section 8–313(1)(a) means actual physical possession of the security). The second method and sixth method (810 ILCS 5/8–313(1)(f) (1993)) apply to uncertified securities, which are inapplicable here. *See* Order Dated June 14, 1992 (holding that the securities at issue were "certified" at all times). Sections 8–313(1)(c), (d), (h)(i) and (j) are inapplicable here because no financial instruction was involved. Section 5/8–313(1)(e) does not apply because Stone never received the certified security and, therefore, could not acknowledge she held for Robinson Engineering. Section 8–313(1)(g) applies to clearing corporations. Section 8–313(1)(h)(i) also involves a financial intermediary, and sections 8–313(1)(h)(iii) and (iv) involve uncertified securities. By process of elimination, the only methods potentially applicable to the instant case are section 8–313(1)(h)(ii) or section 8–313(1)(i).

■ Neither section applies in the instant case. Under 8–313(1)(h)(ii) several conditions must be met:

(1) the debtor must have signed a security agreement,

(2) the security agreement must contain a description of the security (presumably sufficient to satisfy 9–110),

(3) a third person in possession of the certified security must receive the security agreement (or a written notification signed by the debtor, which may be the security agreement).

Stone did not receive a copy of the security agreement while in possession of the certified security. Therefore, section 8–313(1)(h)(ii) is not satisfied, regardless of whether the security agreement contained an adequate description of the stock.[21]

■ With respect to section 8–313(1)(i), even if the transaction between Robinson Engineering and Stone satisfied this section, the government is correct in noting that any security interest Stone may have had pursuant to this section became unperfected after 21 days because no other section of 8–313(1) was satisfied. *See* 5/8–321(2). The court notes that 21 days began running when Robinson Engineering gave value for the FirstRock stock. *See* 5/8–313(1)(i). Without a perfected security interest in the FirstRock stock as defined by Illinois law, Robinson Engineering, as merely a general, unsecured creditor, has no standing to contest the present forfeiture action. *See United States v. One 1965 Cessna 320C Twin Engine Airplane,* 715 F.Supp. 808, 810–11 (E.D.Ky.1989) (after determining claimant did not have a perfected security interest in seized property under the Kentucky UCC, court concluded claimant had no standing to contest the forfeiture).

■ Robinson Engineering also argues it was prevented from executing a proper security agreement because of the government's actions. It appears Robinson Engineering wishes the court to "ignore" the govern-

**21.** Robinson Engineering argues it should be allowed to "fill in the blanks" of the security agreement so as to adequately describe the stock. However, Robinson Engineering misunderstands the nature of section 8–313(1) which, with the exception of section 8–313(1)(i), requires actions beyond a security agreement which adequately describe the security interest.

ment's conduct or "ignore" Robinson Engineering's failure to conform to the "technicalities" of the UCC. The court declines to do either. Moreover, Robinson Engineering's general reliance on the principles of Article III in reciting its potential injuries if not allowed to contest the present dispute do not show how it would be elevated above the status of a general unsecured creditor. For the reasons set forth in this section, the government's motion to dismiss Robinson Engineering for lack of standing is granted. Robinson Engineering is given leave to amend its verified claim within 30 days to allege facts sufficient to show the existence of a resulting trust.[22] Furthermore, Robinson Engineering's Rule 12(b)(6) motion to dismiss is denied for lack of standing. Should Robinson Engineering timely file an adequate verified claim, it is given leave to re-file its motion to dismiss.

### F. Boosalis

■ Boosalis "loaned" money to eligible FirstRock depositors Streit and Teeters. Streit and Teeters then purchased FirstRock stock, and their names appear on the stock certificates. The court finds the executed "loan agreements" between Boosalis, Teeters and Streit give rise to a resulting trust.

The language in the agreements as well as the testimony set forth in Christensen's affidavit and Boosalis' affidavit indicate that Teeters and Streit may hold legal title to the stock, but the stock was purchased with Boosalis' funds and for his benefit. The court notes that at the time Boosalis tendered money to Hamilton Investments for the purpose of purchasing FirstRock stock, he did not know Teeters and Streit would be the persons using his funds to purchase the stock. Nor does the testimony set forth in Christensen's affidavit indicate Teeters and

Streit knew they were purchasing stock on behalf of Boosalis. Rather, they only knew of Hamilton Investments. However, in his uncontested statement of facts Boosalis states his broker, Marty Flanagan III, executed the agreements between Teeters, Streit and Boosalis. Thus, there is a sufficient nexus between Boosalis' funds and Teeters' and Streit's agreements to support a finding that a resulting trust arose. Boosalis has Article III standing to contest the present forfeiture.[23]

### G. Elite

■ The government argues the pleadings filed by Elite demonstrate, at best, that Elite is an unsecured creditor. According to the government, Elite's "loan agreements" with FirstRock depositors Elliott, Malone, and the Suddarths do not define the property interest vested in Elite nor establish the minimum requirements of a protectable lien.[24] The court disagrees and finds that the agreements between Elite and the various claimants give Elite, at minimum, a facially colorable interest in the present action sufficient to satisfy Article III standing requirements. On its face, the agreement purports to create a partnership, and the court finds the language therein is sufficient to show Elite has, at a minimum, a facially colorable interest in the present dispute to satisfy Article III's standing requirements.

### H. Walter J. Luscy

■ Walter J. Luscy has filed a verified claim[25] in No. 92 C 20288 stating, in pertinent part, that he made an investment of $10,000 in certain bank stock which was going to go public. He made this investment after being contacted on September 23, 1992, by a long time friend who was a secretary to a man who made some investments in SCI.

22. Robinson Engineering also attacks the government's motion to dismiss as untimely, a contention the court addresses in section I.D *supra.*

23. In his reply to the government's memorandum in opposition to his motion to dismiss, Boosalis offers evidence that on May 7, 1993, Teeters and Streit assigned their right, title and interest in the stock to Boosalis. Boosalis asserts he has Article III standing because of the assignments. The court need not address this issue as

it has found Boosalis himself has Article III standing in the present forfeiture action.

24. Elite has failed to respond to the government's argument that it lacks Article III standing to contest the present forfeiture action.

25. Luscy's claim was not timely filed. This court need not consider this procedural problem in view of the disposition of this claim on other grounds.

Luscy states he transferred $10,000 to the account of Brian T. Grant at First Federal.

Like the Fishbane claimants, Luscy is an unsecured creditor and lacks Article III standing to contest the forfeiture of the debtor property. His verified claim does not assert any security interest which would arguably give him standing.

In sum, the court finds Leichter, Shaw (as well as Frericks), Kirschner, Boosalis and Elite have standing to contest the present forfeiture. Furthermore, the government concedes Bragelman has standing. The court will address their respective motions to dismiss or for summary judgment.[26]

## II. Leichter's motion to dismiss

### A. Intent to Deceive

Section 981, in part, authorizes the United States to subject to forfeiture any property "which constitutes or is derived from proceeds traceable to a violation of section ... 1344 of this title[.]" 18 U.S.C. § 981(a)(1)(C) (Supp.1992). Section 1344 is entitled "[b]ank fraud" and states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined ... or imprisoned[.] 18 U.S.C. § 1344 (Supp.1992).

■ Section 1344 requires proof of a specific intent to deceive. *See United States v. Harrod*, 856 F.2d 996, 1001 (7th Cir.1988). Leichter argues that in the instant case the government must prove Leichter was ineligible to exercise subscription rights and he intentionally concealed this ineligibility from FirstRock. As proof that he did not intend to deceive FirstRock, Leichter notes his full

disclosure as Pierce's trustee on the stock order form in that the form clearly lists the stock was to be registered in his name as trustee for Pierce.[27] He argues that, as a matter of law, he cannot be deemed to be intentionally fraudulent.

■ This court finds a question of fact exists as to whether Leichter intentionally defrauded FirstRock. Leichter may be technically correct in that the face of the stock order form indicates Leichter is acting as trustee for Pierce. However, as trustee, Leichter should be acting solely on behalf of Pierce. Herein lies the alleged fraud. In the affidavit attached to the verified complaint, Christensen recounts Pierce's description of the trust between himself and Leichter. According to Pierce, no formal documents were drawn up regarding their relationship. Pierce recounts that Leichter supplied the money in the form of a loan to Pierce and determined how many shares would be purchased. Pierce stated he merely signed the stock order form and placed his name and account numbers in the appropriate places then gave the otherwise blank form to Leichter.[28] Pierce thought Leichter would be purchasing 100 to 200 shares and when he discovered Leichter had purchased 20,000 shares, he stated he was going to contact the bank and cancel the order because the form was not true. (Christensen Aff., at 17). Furthermore, Pierce stated it was his understanding Leichter would also sign the form at the bottom as trustee. While this court earlier stated that questions of fact regarding the trust did not preclude Leichter from possessing the necessary standing to challenge the forfeiture, these same questions of fact preclude dismissal as a matter of law based on Leichter's argument. If the trust was set up like Pierce recounts, Leichter's role was not that of "trustee." Rather, Leichter was a speculator and used the word "trustee" to fraudulently conceal his true role in the scheme. If

---

**26.** Although the court will address the motions filed by each claimant separately, occasionally the claimants' issues overlap. In that instance, the court will address all arguments related to the issue.

**27.** On the form is written, "James B. Leichter, TTEE, [Trustee] UAD [under agreement dated] 9–23–92 for Steven Pierce."

**28.** That Pierce signed the form casts further doubt on Leichter's role as trustee.

Leichter's true role was as purchaser of the stock, he was not acting on behalf of Pierce and arguably violated section 1344.

■ Moreover, Leichter asserts his failure to file a copy of a trust agreement, which the subscription agreement requires, is immaterial because FirstRock accepted the form without such a written agreement. The court disagrees and believes Leichter's failure to submit a written agreement is evidence of his intent.

## B. FirstRock's knowledge

■ Leichter and Kirschner claim there is no violation of section 1344(2) because FirstRock knowingly exposed itself to risk due to the information resulting from the FBI investigation. Leichter asserts the conclusion that "FirstRock had notice, before any stock was issued to Leichter, as Trustee for Pierce, of the facts the Government now asserts show fraudulent conduct on Leichter's part." [29] Leichter offers no proof for this assertion beyond its conclusion that the complaint concedes FirstRock was aware of all material facts surrounding the Leichter/Pierce transaction.[30] Yet Leichter does not refer to any specific part of the complaint to support this conclusion.

Moreover, the government disputes the amount of information available to FirstRock from the FBI investigation prior to this forfeiture action.[31] Nothing in the complaint indicates FirstRock was aware of any information regarding the Leichter/Pierce transaction—or any other allegedly illegal transaction—prior to the conversion. Thus, a question of fact exists regarding FirstRock's knowledge of the allegedly fraudulent activity, rendering dismissal of the verified complaint under Rule 12(b)(6) inappropriate on this ground.

■ Leichter also appears to be arguing that if FirstRock did not know of any fraudulent activity concerning Leichter and Pierce, it should have. Specifically, Leichter asserts FirstRock had a duty to make further inquiries because of Leichter's listed status as Pierce's trustee.[32] However, what FirstRock knew or should have known regarding any risk of loss is a question of fact and inappropriate for this court to determine on a Rule 12(b)(6) motion.

## C. The ownership, custody or control element

Section 1344(2), *inter alia*, renders illegal any scheme whereby a person fraudulently obtains the securities or assets owned by FirstRock or under its custody or control. *See* 18 U.S.C. § 1344(2) (Supp.1993). Leichter and Shaw contend the verified complaint is missing this key element to a section 1344 violation and emphasize the following allegation in the complaint: "The defendant property was obtained by and constitutes proceeds traceable to a knowing scheme to ob-

29. Likewise, Kirschner asserts that the complaint and affidavit "make clear that FirstRock knew all of the pertinent facts regarding the Naramore/Kirschner transaction." *See* Kirschner's Memorandum in Support of Motion to Dismiss, at 11.

30. Kirschner attaches documents to her reply in support of her motion to dismiss, as evidence that FirstRock knew of the government's investigation. However, a party may not attach other matters outside the pleadings to a motion to dismiss for failure to state a cause of action, *see* Fed.R.Civ.P. 12(b), nor to a reply to a motion to dismiss. Therefore, the court refuses to consider these documents.

31. The government also argues the extent of FirstRock's knowledge is irrelevant under the language of section 1344. However, for purposes of claimants' motions to dismiss, the court need not address this issue.

32. In so arguing, Leichter relies on the instructions accompanying each stock order form, wherein it states FirstRock is authorized to make further inquiries when subscription rights are exercised by a trustee. As stated earlier, if a party submits outside material to a Rule 12(b)(6) motion, a court may refuse to consider the material. *See* Fed.R.Civ.P. 12(b)(7). If the court chooses to consider the matter, the motion must be converted to a Rule 56 motion. *See* Fed. R.Civ.P. 12(b)(7); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir.1993). Leichter submits a copy of the stock order form instructions and guide. (*See* Leichter's Memorandum in Support of his Motion to Dismiss, Exh. C). As this court does not wish to convert Leichter's motion to one for summary judgment at this stage of the litigation, his attached exhibits will not be considered. However, the essence of Leichter's argument can be addressed without referring to the instructions.

tain securities of a financial institution by means of false and fraudulent pretenses and representations as more fully described in the affidavit attached hereto and incorporated herein." (*See* Compl., ¶ 5). Shaw argues the "of" in the government's complaint does not satisfy the ownership requirement of section 1344(2).

■ In arguing the government has not pled the securities were under the custody or control of FirstRock, Leichter and Shaw fail to refer to the affidavit attached to the complaint which the government specifically incorporated therein. The court agrees with the government that it may properly consider the attached affidavit in determining whether the government has sufficiently pled a cause of action to survive a motion to dismiss. The Admiralty Rules, which govern forfeiture cases under section 981, *see* 18 U.S.C. § 981(b)(2) (Supp.1992), authorize a court to review the verified complaint and any supporting papers to determine whether an action *in rem* appears to exist before authorizing a warrant to seize the property. *See* Supp.R. C(3). If a court may consider supporting papers in deciding whether to issue a warrant, it logically follows that a court may consider those same supporting papers to determine whether the government has stated a cause of action, an inquiry closely related to whether a warrant should issue. *See United States v. 4492 S. Livonia Rd.,* 889 F.2d 1258, 1266 (2d Cir.1989) (in determining the sufficiency of a complaint in a forfeiture action, courts may examine any supporting affidavits to determine whether they cure a lack of particularity in the complaint itself); *United States v. 288–290 North St.,* 743 F.Supp. 1068, 1074–75 (S.D.N.Y.1990) (same).

■ According to the language of the statute, the securities must have been owned by FirstRock or in its custody or control at the time individuals obtained or attempted to obtain the securities by false representations. *See United States v. Blackmon,* 839 F.2d 900, 904 (2d Cir.1988) (the property must be ob-

tained at a time when the bank has custody or control of the property).[33] The verified complaint and supporting affidavit sufficiently show the government has pled that the defendant property was in the custody or control of FirstRock at the time of the alleged illegal activity for purposes of this motion. While each complaint does not contain express language that the stock was in FirstRock's "custody or control" at the time of the fraudulent activity, Christensen's affidavit contains numerous allegations to support this element.

■ Leichter and Kirschner argue the shares could not have been in FirstRock's custody or control because they did not come into existence until issued on October 2, 1992, at which time they were transferred to an underwriter. According to the language of section 1344, the property must be in FirstRock's ownership, custody or control *at the time of the fraudulent activity.* Although the transactions which gave rise to the present disputes occurred on or before September 24, 1992, the executed agreements remained in effect and the fraudulent activity continued until at least October 2, 1992, when the shares were issued. That the shares were then transferred to an underwriter is inconsequential, as the underwriter was the agent of FirstRock.

■ Shaw and Kirschner argue the stock was not in FirstRock's custody or control at the time of the alleged fraudulent activity "in the usual way financial institutions own or control securities." According to Shaw, the stock was not entrusted to FirstRock by customers. Rather, the stock was "simply" a vehicle for altering the type of ownership of First Federal. An inquiry into a financial institution's motive as to why it owns, controls or retains custody over a security is not dictated by the language of the statute, and the court declines to do so. Moreover, there is nothing to suggest FirstRock was conduct-

---

**33.** *But see United States v. Falcone,* 934 F.2d 1528, 1545 (11th Cir.) (bank fraud statute contains no requirement that the funds be in the custody or control of the bank at the time the false or fraudulent representation is made), *vacated on other grounds, reh'g en banc granted,* 939 F.2d 1455 (1991), *reinstated in relevant part,* 960 F.2d 988 (en banc), *cert. denied,* — U.S. —, 113 S.Ct. 292, 121 L.Ed.2d 216 (1992). This court believes the *Blackmon* court's interpretation of § 1344 comports with the statute's plain language.

ing its conversion process other than in the "usual" manner.

### D. Public Policy

■ Leichter also argues the seizure of a publicly traded stock should be vacated because it unfairly penalizes the owners of the seized stock. Because of its volatile nature, Leichter argues, seizure of the stock is improper and subjects him to an unreasonable risk of loss. The court is not persuaded by Leichter's argument as it defies the clear language of sections 981 and 1344 when read in conjunction. Section 981 broadly subjects to forfeiture *"any property, real or personal,* which constitutes or is derived from a violation of ... section 1344." *See* 18 U.S.C. § 981(a)(1)(C) (Supp.1992) (emphasis added). In turn, section 1344 penalizes anyone who knowingly and fraudulently obtains "moneys, funds, credits, assets, *securities* or other property" owned by a financial institution. *See* 18 U.S.C. § 1344(2) (Supp.1992) (emphasis added). By specifically listing "securities" in section 1344, Congress intended such property to be subject to forfeiture under section 981.

■ Nor is this court persuaded by Leichter's argument that seizing 10% of outstanding FirstRock stock constitutes an unreasonable seizure in violation of the Fourth Amendment. Leichter contends that by seizing such a large portion of FirstRock's outstanding stock the government has artificially reduced the available pool of FirstRock shares. According to Leichter, two groups of shareholders are unfairly penalized as a consequence: those who bought immediately after the seizure, and those who purchased FirstRock stock after the seizure and do not sell before the seized stock is returned to the market.[34] However, as the government notes, Leichter's standing to make this argument is doubtful because he does not fall within either category. Additionally, Leichter has not shown a distinct and palpable injury as opposed to an abstract or hypothetical injury, thus failing to satisfy a core component of Article III standing. *See Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1296 No. 92-2518, slip op. at 5 (7th Cir.1993).

■ Leichter also asserts less burdensome alternatives existed for the government to achieve its objectives. However, the court rejects this argument. The plain language of section 981 does not require the government to weigh less burdensome alternatives before subjecting property to forfeiture.[35]

### III. Shaw's motion to dismiss

### A. Johnson Shares

■ In his memorandum in support of his motion to dismiss, Shaw argues the complaint fails to plead facts sufficient to state a claim for forfeiture of the Johnson shares. Specifically, Shaw argues the allegations in the complaint do not show that Johnson had any agreement regarding the sale or transfer of his stock. Oddly enough, in his response to the government's motion to strike Shaw for lack of standing, Shaw asserts the existence of such an agreement in arguing he has Article III standing in the present dispute. Specifically, in detailing the loan agreements between SCI and depositors Johnson, Steinhagen, Church, Drew and "Grant," Shaw states, "Between September 17 and September 24, 1992, each of these five depositors executed and entered into written agreements with Claimants operating through SCI." Moreover, Shaw has filed a verified claim, in part, for the stock purchased by Johnson. In light of his earlier position regarding Johnson, the court finds Shaw has waived this argument.

■ Moreover, as Shaw himself notes, the complaint alleges: (1) Johnson signed and submitted a stock order form for FirstRock stock; (2) on September 23, 1992, an FBI agent observed Shaw enter a branch

---

**34.** The government appears to address, in part, Leichter's constitutional attack as a violation of the procedural component of the Due Process Clause. This court understands Leichter to be asserting a violation of the substantive prong of the Due Process Clause and, therefore, need not address the procedural aspects of the seizure.

**35.** Leichter's arguments concerning any risk of loss FirstRock may have suffered are addressed *infra,* Part III, C.

office of First Federal; (3) the agent later determined Shaw hand delivered original stock order forms in the name of Johnson; (4) on October 2, 1992, Johnson stated in an interview that he had "come into" some money and refused to answer further questions. Contrary to Shaw's assertion, these allegations give rise to a reasonable inference that an agreement existed between Shaw and Johnson.

## B. Section 563b.3(i)(1)

Shaw, Bragelman, Boosalis and Elite assert the gravamen of the government's claimed violation of section 1344(2) rests on a violation of section 563b.3(i)(1) of the OTS regulations. *See* 12 C.F.R. § 563b.3(i)(1), (2) (1993).[36] Shaw contends that, as a matter of law, the loan agreements between SCI and the depositors do not violate the OTS regulation. Kirschner also argues the security agreement between herself and Naramore does not violate the OTS regulation.

The government argues it need not prove a violation of the OTS regulation. Rather, it need only prove a violation of section 1344. According to the government, section 1344(2) was violated when Shaw participated in a scheme to solicit First Federal depositors to purchase shares on behalf of Shaw. As part of the scheme, the depositors signed stock order forms which stated, in part:

> Under penalty of perjury, I certify that ... I am purchasing shares solely for my own account and that there is no agreement or understanding regarding the sale or transfer of such shares, or my right to subscribe for shares herewith.
>
> **Federal Regulations prohibit any person from transferring or entering into any agreement directly or indirectly to transfer, the legal or beneficial ownership of conversion subscription rights,**

**or the underlying securities to the account of another.**

(*See 122,942 shares* Compl., Exh. B, C–1 to – 6).

 As the government notes, the depositors perjured themselves because they were not purchasing the shares solely for the depositor's sole account, and there were agreements between the depositors and various third parties regarding the sale or transfer of the shares. The government asserts nothing more is required to constitute a violation of section 1344. The court agrees. Nothing in section 1344 refers to the OTS regulations, and the court declines to ignore the clear language of the statute by incorporating an agency regulation into the statute.

 Shaw argues section 1344 requires a false statement or representation. Shaw asserts no falsity arises in the instant case because his pre-conversion agreements do not fall within the meaning of section 563b.3(i)(1). However, a false representation may violate section 1344 without violating the OTS regulations. The instant case represents such a situation. FirstRock's stock order form requires each depositor to sign, under penalty of perjury, that there is *no* agreement or understanding regarding the sale or transfer of such shares. The stock order form is more inclusive than the OTS regulation, forbidding *any* agreement regarding the sale or transfer of the stock. As such, the loan agreements may constitute a violation of section 1344 but not constitute a violation of section 563b.3(i) in the instant case.[37]

 Shaw argues the language in the stock order forms paraphrases the language found in section 563b.3(i) and was intended to have the same meaning as section 563b.3(i). Shaw also notes David A. Ingrassia, President of FirstRock, states the certifications in

---

**36.** Section 563b.3(i) states, in part:
(1) *Prohibited transfers.* Prior to the completion of a conversion, no person shall transfer, or enter into any agreement or understanding to transfer, the legal or beneficial ownership of conversion subscription rights, or the underlying securities to the account of another.
(2) *Prohibition of offers and certain acquisitions.* Prior to the completion of a conversion, no person shall make any offer, or any an-

nouncement of an offer, for any security of the converting savings association issued in connection with the conversion[.]
12 C.F.R. § 563b.3(i)(1), (2) (1993).

**37.** In light of the misrepresentations contained in the stock order form, the court need not address whether Shaw's activities violate section 563b.3(i).

the stock order forms were included to insure compliance with the OTS regulations. Shaw concludes the certifications are based solely on the prohibitions in section 563b.3(i)(1) and their truth or falsity must be determined through an analysis of that section.

▪ The court rejects Shaw's contention. The stock order form contains a clear proscription against all agreements and understandings regarding the sale or transfer of the FirstRock stock, and the court declines to alter this language by incorporating a federal regulation. The stock order form may contain this proscription because of section 563b.3(i)(1), as Shaw notes. Nevertheless, there may be other federal regulations prohibiting different agreements which FirstRock intended to prevent without enumerating each specific, prohibited agreement. For example, Shaw admits the loan agreements contain an offer to sell the FirstRock stock to SCI. Yet, Shaw argues the agreements do not violate section 563b.3(i)(2) because the stock order forms contain no prohibitions regarding pre-conversion *offers* to sell the FirstRock stock and, therefore, no fraud was committed upon FirstRock. However, the stock order forms prohibit all agreements and *understandings;* this includes understandings to offer stock. By writing its stock order form in broad language, FirstRock avoids the necessity of articulating each federal regulation it is adhering to. The court finds the government need only plead and prove the elements of section 1344.

▪ Kirschner argues the pledge agreement (which she alternatively refers to as a "loan" agreement) does not violate FirstRock's stock order form because nothing in its terms prohibited Naramore from borrowing money to purchase stock and pledging the stock as collateral. However, a factfinder is entitled to infer that the arrangement between Kirschner and Naramore was for the sale of the stock and that Naramore was not purchasing the stock on her own account. Kirschner's argument fails.[38]

---

38. To the extent Kirschner argues there was no false representation sufficient to satisfy § 1344 because the pledge agreement did not violate § 563b.3(i) of the OTS regulations, this argument

▪ Likewise, Boosalis asserts the present dispute hinges, in part, on whether the "loan arrangement" between Teeters, Streit and himself is a "sale" or "transfer of the legal or beneficial ownership" of the stock based on the language of section 563b.3(i). This is incorrect. The issue is whether Teeters and Streit purchased stock on their own account and whether there existed an agreement or understanding regarding the sale or transfer of such shares, or their right to subscribe for shares. In other words, the issue is whether Teeters and Streit perjured themselves in signing the stock order form. This issue is for a factfinder, and Boosalis' argument is rejected.

## C. Risk of loss

Shaw and Kirschner assert the conduct alleged in the complaint does not constitute bank fraud because FirstRock was not exposed to a risk of loss, nor was its financial integrity otherwise threatened. The majority of cases hold that a perpetrator's fraud need not cause a financial institution to suffer an actual loss for a valid conviction under section 1344. *See United States v. Briggs,* 965 F.2d 10, 12 (5th Cir.1992) and cases cited therein, *cert. denied,* ___ U.S. ___, 113 S.Ct. 1016, 122 L.Ed.2d 163 (1993); *United States v. Lemons,* 941 F.2d 309, 316 n. 3 (5th Cir. 1991). Rather, the majority of circuits hold that to support a conviction under section 1344, the government need only prove a risk of loss. *See Briggs,* 965 F.2d at 12–13 (exposure to civil liability sufficient to show bank suffered a risk of loss under section 1344); *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.) (perpetrator's scheme to defraud bank must expose bank to actual or potential loss), *cert. denied,* ___ U.S. ___, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992); *United States v. Young,* 952 F.2d 1252, 1257 (10th Cir.1991) (same); *Lemons,* 941 F.2d at 316 (government need only prove bank suffered risk of loss and not that an actual loss was incurred); *United States v. Morgenstern,* 933 F.2d 1108, 1114 (2nd Cir.1991)

fails for the same reasons set forth above. The government is not required to prove a violation of § 563b.3(i) in the instant case to prove a false representation for purposes of § 1344.

(same). *But see United States v. Blackmon,* 839 F.2d 900, 906 (2d Cir.1988) (fraud must threaten the financial integrity of a bank for purposes of section 1344).

██ The court believes the Seventh Circuit, if confronted with this issue, would endorse the majority view and hold that a scheme to defraud which exposes a bank to a risk of loss is sufficient to satisfy section 1344. As the Second Circuit noted in *United States v. Stavroulakis,* 952 F.2d 686, 694 (2d Cir.1992), the bank fraud statute renders illegal an individual's attempt to defraud a bank. "It is worth emphasizing that the bank need not actually be victimized; the statute makes an individual criminally culpable for devising and executing or *attempting* to execute such a scheme with the intent to victimize the bank." *Stavroulakis,* 952 F.2d at 694; *see also United States v. Solomonson,* 908 F.2d 358, 364 (8th Cir.1990).

██ The court finds that whether FirstRock was exposed to a risk of loss is a question for the factfinder to determine. The government argues FirstRock's failure to detect the alleged scheme could have exposed it to civil liability. Under OTS regulations, *see* 12 C.F.R. § 563b.3(i), and its conversion plan, FirstRock had a duty to initially offer its stock to eligible FirstRock depositors to the exclusion of outsiders. The alleged fraudulent orders in the instant case caused an oversubscription of shares, resulting in a reduction of shares available for eligible depositors. Had the alleged scheme been executed, the government argues, eligible depositors could have sued FirstRock for breaching its duty in issuing stock to fraudulent depositors.[39]

██ The government's proposition is sufficient to withstand a motion to dismiss. Risk of exposure to civil liability satisfies section 1344, as stated above. Nor does the court believe the government's theory is highly speculative, as Shaw and Kirschner argue. *Cf. United States v. Lankford,* 573 F.2d 1051, 1053 (8th Cir.1978) (bank owes a duty of care towards its customers regarding deposits in its custody and control). Shaw argues FirstRock was not exposed to any risk of loss because only eligible depositors purchased FirstRock stock. This argument presumes Shaw's conduct was legal, a presumption the court refuses to make at this stage.

██ Additionally, Shaw and Leichter argue FirstRock could not have suffered any risk of loss because had the alleged scheme not existed, FirstRock would have sold its stock to other depositors and received the same price.[40] However, implicit within this argument is the understanding that had claimants not become involved in the present alleged scheme, FirstRock would have been able to offer its stock to eligible depositors who had not executed agreements in violation of the stock order form. It was prevented from doing so because of the present claimants' involvement. Such a scheme does not require a resulting monetary loss; it is enough that FirstRock was deprived of the right to offer its stock to legitimate depositors. *See Carpenter v. United States,* 484 U.S. 19, 26, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (a scheme to defraud does not require a monetary loss; it was enough newspaper was deprived of its right to exclusive use of its confidential information); *United States v. Walters,* 711 F.Supp. 1435, 1445 (N.D.Ill.1989) (business agents submitted false information to universities regarding student athletes; even if the universities would have paid out the same amount of money in athletic scholarships to other students, the universities were still defrauded by these particular student-athletes), *rev'd*

---

**39.** Kirschner argues the present forfeiture action does not address the alleged injury to individuals who would have otherwise obtained the stock because the stock will not be offered to these persons. Assuming this fact is true, Kirschner's argument is irrelevant. There is no requirement that a forfeiture action inure to the benefit of third persons.

**40.** Leichter argues FirstRock does not face any risk of loss because it has executed an agreement with the government whereby it will be able to repurchase the shares at the original price ($8.75). This is a fact not properly before the court which the court refuses to consider.

*on other grounds,* 913 F.2d 388 (7th Cir. 1990).[41]

 Shaw argues *Walters* is inapplicable because the court found the universities would not have given scholarships to the students at issue had they known of the fraud. In the instant case, Shaw argues FirstRock knew of the alleged perpetrators. As the court noted earlier, this is a question of fact and inappropriate to resolve in this motion.

Additionally, Shaw ignores the potential liability FirstRock may have faced from OTS had the alleged scheme been executed. Factual issues exist as to FirstRock's potential liability if OTS had determined the agreements at issue violated its regulations. OTS is responsible for administering and enforcing, the Home Owners' Loan Act of 1933, 12 U.S.C. § 1461 *et seq.,* the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.,* the Bank Protection Act of 1968, 12 U.S.C. § 1881 *et seq.,* the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* 12 C.F.R. § 500.1 (1993). Under its regulations, OTS has the authority, *inter alia,* to institute cease-and-desist and/or change-in-control proceedings, or assess civil money penalties for violations of these acts. 12 C.F.R. § 509.1 (1993).[42] While the court makes no finding as to whether the instant case would warrant such sanctions, questions of fact exist as to whether the disputed agreements would have potentially subjected FirstRock to such measures.[43]

 Shaw argues the applicability of section 1344 in the instant case would extend section 1344 beyond the bounds Congress intended. The court disagrees. Section 1344(2) was modeled after the wire and mail fraud statutes and reaches a wide range of fraudulent activity. *Lemons,* 941 F.2d at 314. The existence of section 563b.3(i) lends credence to the notion that section 1344 liability is appropriate in the instant case.

### D. Proceeds

 Shaw argues the shares issued to "Grant" are not "proceeds" within the meaning of the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C) (Supp.1993) and, therefore, are not subject to forfeiture.[44] Shaw argues the use of the word "proceeds" in section 981 contemplates successful completion of the scheme. The court rejects this interpretation of section 981. First, as the government notes, Shaw's reading of section 981 would effectively obviate that portion of section 1344 which forbids an attempt to defraud a bank.[45]

 Second, Shaw ignores the complete language of the forfeiture statute. Section 981 authorizes the government to seize property which constitutes a violation of section 1344, as well as proceeds traceable to such a violation. *See* 18 U.S.C. § 981(a)(1)(C) (Supp.1993). In the instant case, the stock is the property which constitutes a violation of section 1344. In adopting this interpretation, the court rejects for the purposes of this motion Leichter's assertion that section 981 only allows the government to seek forfeiture of the claimants' profits. On the contrary, section 981 authorizes the government to seize the *res* as well as any proceeds. Here,

---

**41.** It is appropriate to rely on cases construing the mail and wire fraud statutes, as § 1344 was modeled after these statutes. *Young,* 952 F.2d at 1255–56.

**42.** For example, had OTS determined the agreements violated its regulations and entered a cease-and-desist order to prevent FirstRock from executing its conversion, the bank itself would have incurred substantial loss.

**43.** Shaw argues a violation of § 563b.3(i) does not result, *a fortiori,* in a violation of § 1344. The court makes no finding regarding this issue, but merely notes that if OTS determined FirstRock violated § 563b.3(i), such a violation could satisfy the "risk of loss" element of a § 1344 violation.

**44.** Shaw correctly notes the FBI agent's involvement in the alleged scheme does not necessarily preclude liability under § 1344(2), which also forbids attempts to defraud a bank.

**45.** For the same reason, the court rejects Boosalis' argument that use of the word "obtain" requires that the guilty party "come into possession of" property belonging to the bank. Such an interpretation obviates that portion of section 1344 which renders *attempts* to defraud a bank illegal.

the *res* is the stock.[46] For the reasons stated above, Shaw's motion to dismiss is denied.

In her memorandum in support of her motion for summary judgment and again in her motion to dismiss, Kirschner also argues the $211,600 she loaned to Naramore was not "proceeds" of a bank fraud. Kirschner's argument is premised on the theory that by seeking forfeiture of the shares, the government is effectively seeking forfeiture of her money. In so arguing, Kirschner ignores the nature of an *in rem* proceeding. Forfeiture actions proceed on the legal fiction that inanimate objects themselves are guilty of wrongdoing, which is reflected in the object being the formal defendant. *United States v. On Leong Chinese Merchants Ass'n Bldg.*, 918 F.2d 1289, 1293 (7th Cir. 1990), *cert. denied*, — U.S. ——, 112 S.Ct. 52, 116 L.Ed.2d 29 (1991). The government has seized the FirstRock stock, not the money Kirschner loaned to Naramore. Kirschner's argument is without merit.

### IV. Kirschner's motion for summary judgment

Kirschner seeks to invoke in her motion for summary judgment the "innocent owner" defense set forth in section 981. According to section 981(a)(2):

> No property shall be forfeited under this section to the extent of the interest of an owner or lienholder by reason of any act or omission established by that owner or lienholder to have been committed without the knowledge of that owner or lienholder.

18 U.S.C. § 981(a)(2) (Supp.1993).

Kirschner asserts her loan to Naramore in return for a pledge of the shares as collateral for the loan created a security interest in the shares in favor of Kirschner. The court agrees. Although the security agreement does not create a perfected security interest, *see supra* section I(D), Kirschner is a lienholder with respect to the shares.

In asserting the "innocent owner" defense, a claimant has the burden of proving by a preponderance of the evidence that she was an innocent owner or lienholder. *See United States v. 7326 Highway 45 North*, 965 F.2d 311, 314–15 (7th Cir.1992). In determining whether a lienholder is "innocent," a court must employ a subjective rather than objective standard for assessing the claimant's knowledge. *See 7326 Highway 45 North*, 965 F.2d at 315–16.[47] Here, there is no question Kirschner was subjectively aware of the transaction in dispute because she was involved. Kirschner argues she should be allowed to invoke the innocent owner defense because she was not subjectively aware of the illegality of her involvement.

The court rejects this interpretation of the "innocent owner" defense set forth in section 981(a)(2). In *United States v. 316 Units of Municipal Securities*, 725 F.Supp. 172, 180 (S.D.N.Y.1989), the District Court for the Southern District of New York addressed this issue. The court held that "innocent owner" within the meaning of section 981(a)(2) refers to lack of knowledge of the illegal transaction, not lack of knowledge of the transaction's illegality. *316 Units of Municipal Securities*, 725 F.Supp. at 180. This holding is supported by the plain language of section 981(a)(2), which refers only to acts committed without the knowledge of the owner or lienholder. *316 Units of Municipal Securities*, 725 F.Supp. at 180 (emphasis in original). The court concluded that because the claimants were actively engaged in the allegedly illegal transactions, they were not "innocent owners." *316 Units of Municipal Securities*, 725 F.Supp. at 180. This court rejects Kirschner's interpretation of the "innocent owner" defense and need not address Kirschner's remaining arguments regarding this defense. The remainder of Kirschner's arguments have been addressed in various sections throughout this opinion. For the reasons set forth above, Kirschner's motion

---

46. The court finds inapposite *United States v. Elliott*, 727 F.Supp. 1126 (N.D.Ill.1989), cited by Leichter, as the government had not seized any stock in that case.

47. In *One Parcel*, the Seventh Circuit analyzed 21 U.S.C. § 881(a)(7), which prohibits forfeiture of property "by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

to dismiss and her motion for summary judgment are denied.

### V. Bragelman's motion to dismiss

In his memorandum in support of his motion to dismiss, Bragelman challenges the Magistrate Judge's finding of probable cause. At the outset the court notes Bragelman's motion includes many facts not properly before the court, and, consequently, it will not consider those in determining his motion.

An *in rem* forfeiture proceeding normally involves three steps: (1) the government's request for a warrant to seize the defendant property; (2) a complaint for forfeiture pursuant to the Admiralty Rules; and, (3) the civil forfeiture trial itself during which the government bears the burden of producing enough evidence to establish probable cause that the defendant property constitutes proceeds of the illegal conduct. *See United States v. One Parcel of Real Property*, 921 F.2d 370, 373 (1st Cir.1990). At the second stage, the complaint must allege facts sufficient to support a reasonable belief that the government could demonstrate probable cause at trial for finding a connection between the illegal activity and the property. *One Parcel of Real Property*, 921 F.2d at 376; *United States v. Hanson Brook, Town House Rd.*, 770 F.Supp. 722, 724 (D.Me. 1991). Probable cause is "a reasonable ground for belief of guilt; supported by less than prima facie proof but more than mere suspicion." *United States v. $250,000*, 808 F.2d 895, 897 (1st Cir.1987) (quoting *United States v. $364,960*, 661 F.2d 319, 323 (5th Cir.1981)); *Hanson Brook, Town House Rd.*, 770 F.Supp. at 724. In determining whether the complaint supports a reasonable belief for probable cause, a court should examine the "aggregate of facts," according due regard for common sense and reason. *One Parcel of Real Property*, 921 F.2d at 376. The government may support the complaint with any reliable evidence, including circumstantial evidence, regardless of its admissibility at trial. *Hanson Brook, Town House Rd.*, 770 F.Supp. at 724. Moreover, a Magistrate Judge's finding of probable cause for purposes of a seizure warrant is not subject to *de novo* review. *United States v. 343 East 12th Ave.*, 755 F.Supp. 823, 824–25 (C.D.Ill. 1991). Rather, if the magistrate had a substantial basis for concluding that probable cause existed, the court must uphold the warrant and find the government has carried its initial burden of showing probable cause. *343 East 12th Ave.*, 755 F.Supp. at 825; *Hanson Brook, Town House Rd.*, 770 F.Supp. at 731. Once probable cause is shown, the burden shifts back to claimants to show that the factual predicates for forfeiture have not been met. *United States v. $200,000, Representing Contents of a First Penn–Pacific Life Ins. Co. Annuity Acct.*, 805 F.Supp. 585, 589 (N.D.Ill.1992).

The court finds Magistrate Judge Mahoney was not clearly erroneous in finding probable cause to believe Bragelman's shares were subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). A reading of the affidavit attached to the complaint supports this conclusion.[48] During an interview with an FBI agent, Bragelman insisted he purchased the FirstRock stock on his own account and received over $200,000 from another person as a "loan." However, Bragelman also stated there was no written agreement evidencing this "loan," no repayment terms had been discussed, no interest rate was being charged on the loan, nor could he supply the last name or telephone number of this person. Additionally, although Bragelman asserted he had full ownership of the stock, all the risk of the purchase was assumed by the third person. As stated above, in considering these statements, the court is not required to set aside reason or common sense. The stated "terms" of Bragelman's agreement are at odds with normal business dealings, and a factfinder could reasonably infer that there was more than a "loan agreement" between Bragelman and the third per-

---

**48.** The court has already determined it is proper to consider the complaint and affidavit. *See supra* section II(C).

son. The complaint supports the Magistrate Judge's finding.[49]

## VI. Boosalis' motion for summary judgment [50]

Boosalis argues the agreement between himself and Teeters and Streit was in conformance with Illinois law and, therefore, there was no agreement to transfer or sell their stock to him. However, the stock order form does not require a validly enforceable contract. Rather, FirstRock's stock order form contains a certification which states, in part, there is no agreement *or understanding* regarding the sale or transfer of the stock. Thus, it is irrelevant whether Boosalis is the beneficial owner of the stock or holds a security interest in the stock. As stated earlier, a factfinder could reasonably conclude that the agreements executed between Teeters, Streit and Boosalis were regarding the sale or transfer of the stock. Therefore, the court rejects Boosalis' argument.

To the extent Boosalis argues neither he, Teeters nor Streit intended to defraud FirstRock, this is a question for the factfinder. All parties admit to the existence of agreements between Boosalis and Teeters and Streit. These agreements alone sufficiently support the government's allegation that the parties intended to deceive FirstRock such that they withstand a Rule 12(b)(6) motion to dismiss.[51]

Boosalis' reply to the government's motion to strike contains new arguments based on evidence not properly before the court. To the extent Boosalis argues the

government's investigation has perpetrated a fraud on the court so that dismissal of the present forfeiture action is warranted, the court rejects this contention. There is no proof the government has misrepresented to the court or committed a fraud against the court. On the contrary, the government's evidence supports its complaint. Moreover, Boosalis has not filed a formal motion for sanctions so that the court has no motion upon which to rule regarding this issue.[52]

Boosalis has not supplied the court with a memorandum in support of his motion to dismiss, which contains widespread requests for relief. Absent any supporting memorandum with applicable case law, the court will assume Boosalis has abandoned his motion to dismiss, and it declines to address the arguments contained therein. Boosalis' motion for summary judgment and his motion to dismiss are denied.

## VII. Elite's motion to dismiss

All arguments set forth in Elite's amended motion to dismiss have been advanced by other claimants and rejected by the court. Thus, its amended motion to dismiss is denied.

## CONCLUSION

For the reasons stated above, the government's motion to strike claims is granted in part and denied in part. The Fishbane claimants, Robinson Engineering and Walter J. Luscy are dismissed from the present forfeiture action for lack of Article III standing and given leave to file amended verified claims within 21 days to support a finding of

49. At trial, Bragelman may be able to refute the government's showing of probable cause. However, he has not done so here, and the "facts" alleged in his motion to dismiss are not properly before the court, as noted previously.

50. Certain of Boosalis' arguments rest on the assumption that the government must prove a violation of 12 C.F.R. § 563b.3(i) (1993). However, the court rejected this proposition, *see supra* § III(B), and will not address those particular arguments.

51. To the extent Boosalis argues neither he, Teeters nor Streit knew of the illegality of their

actions, *see supra* section IV. Moreover, the court is unpersuaded by Boosalis' reliance on *United States v. 92 Buena Vista Ave.,* —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993), which is inapplicable to the present action.

52. Additionally, Boosalis' reply brief raises an argument that FirstRock is not a financial institution within the meaning of section 1344. Because Boosalis waited until his reply brief to raise this argument, the court considers it waived. *See Wilson v. Giesen,* 956 F.2d 738, 741 (7th Cir.1992) (argument not raised until reply brief is considered waived, as it gives opposing side no opportunity to respond).

a resulting trust. The government's motion to strike is denied as to all other claimants. All claimants' Rule 12(b)(6) motions or motions for summary judgment are denied.